IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **MOHAMMED RAJEB ABU GHANEM,** also listed as, MOHAMMED RAJEB SADIQ ABU GHANIM, *Petitioner,* v **GEORGE W. BUSH,** *et al.,* *Respondents.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **CIV. ACT. NO. 05-CV-01638 (CKK) (JR)** |

**[PROPOSED] BRIEF OF *AMICUS CURIAE* ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK IN SUPPORT OF PETITIONERS**

The Association of the Bar of the City of New York
By:
Committee on Military Affairs and Justice
Natalie Kabasakalian
Michael Mernin
42 West 44th Street
New York, NY 10036
(212) 382-6600

Edward Labaton
100 Park Avenue, 12th Floor
New York, NY 10017-5563
(212) 907-0700

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... ii

INTEREST OF AMICUS CURIAE ..............................................................................................1

PRELIMINARY STATEMENT ...................................................................................................2

ARGUMENT .................................................................................................................................2

I.    THE ATTORNEY-CLIENT PRIVILEGE IS ESSENTIAL TO THE
INTEGRITY OF OUR ADVERSARIAL SYSTEM OF JUSTICE ...................................2

II.    THE ATTORNEY-CLIENT PRIVILEGE IS AT THE HEART OF
PETITIONERS' RIGHT OF MEANINGFUL ACCESS TO THE COURTS ....................7

III.    IN CARRYING OUT WHOLESALE IMPOUNDMENT AND REVIEW
OF CERTAIN PRIVILEGED MATERIALS, RESPONDENTS
VIOLATED THE ATTORNEY-CLIENT PRIVILEGE ....................................................9

IV.    THE SECURITY CONCERNS RESPONDENTS CITE DO NOT OFFER
A COMPELLING RATIONALE FOR CURTAILING DUE PROCESS
PROTECTIONS ...............................................................................................................11

CONCLUSION ............................................................................................................................12

## TABLE OF AUTHORITIES

### CASES

*Adem v. Bush*,
   425 F. Supp. 2d 7 (D.D.C. 2006) ...................................................................................7

*Al Odah v. United States*,
   346 F. Supp. 2d 1 (D.D.C. 2004) ...................................................................................7

*Fisher v. United States*,
   425 U.S. 391 (1976) .......................................................................................................6

*Gomez v. Vernon*,
   255 F.3d 1118 (9th Cir. 2001) .......................................................................................8

*In re Guantanamo Detainee Cases*,
   344 F. Supp. 2d 174 (D.D.C. 2004) ...............................................................................7

*Hamdan v. Rumsfeld*,
   126 S. Ct. 2749 (2006) ............................................................................................11, 12

*Maine v. Moulton*,
   474 U.S. 159 (1985) .......................................................................................................7

*Martin v. Lauer*,
   686 F.2d 24 (D.C. Cir. 1982) .........................................................................................7

*Rasul v. Bush*,
   542 U.S. 466 (2004) .......................................................................................................7

*Swidler & Berlin v. United States*,
   524 U.S. 399 (1998) .....................................................................................................11

*United States v. DeFonte*,
   441 F.3d 92 (2d Cir. 2006) ............................................................................................8

*United States v. Philip Morris Inc.*,
   314 F.3d 612 (D.C. Cir. 2003) .................................................................................5, 11

*United States v. Zolin*,
   491 U.S. 554 (1989) .................................................................................................4, 10

*Upjohn Co. v. United States*,
   449 U.S. 383 (1981) ...................................................................................................3, 5

**STATUTES & RULES**

Fed. R. Evid. 501 ..................................................................................................................10

Restatement of Law Governing Lawyers § 60 (2000)......................................................................6

**MISCELLANEOUS**

ABA Code of Professional Responsibility, Ethical Consideration 4-1 ..........................................6

McCormick, *On Evidence* § 87 (4th Ed.) ......................................................................................3

Note, 91 Harv. L. Rev. 464 (1977) ...........................................................................................2, 5

Max Radin, *The Privilege of Confidential Communication Between Lawyer and Client*,
    16 Cal. L. Rev. 487 (1928)................................................................................................2, 3, 4, 6

Rice, *Attorney-Client Privilege in the United States* (2d Ed 1999)
    Restatement (Third) of Law Governing Lawyers § 60 (2000) ...................................................4

Stephen A. Saltzburg, *Privileges and Professionals: Lawyers and Psychiatrists*,
    66 Va. L. Rev. 97, 604 (1980) ...............................................................................................2, 3, 4

B. Wigmore (Evidence) § 2290 (McNaughton Rev. 1961) ...........................................................2

Charles Alan Wright & Kenneth Graham, *Federal Practice and Procedure* § 5001
    (2006) .........................................................................................................................................2

The Association of the Bar of the City of New York respectfully submits this brief, as Friend of the Court, in support of Petitioners' opposition to Respondents' motion for the appointment of a Department of Defense "filter team" to review confidential detainee materials seized without notice to counsel or the Court, in plain violation of the attorney-client privilege.

## INTEREST OF AMICUS CURIAE

The Association of the Bar of the City of New York ("ABCNY") is among the nation's oldest and largest bar associations. Founded in 1870, ABCNY has long been committed to maintaining the highest ethical standards of the profession, promoting reform of the law, and providing service to the profession and the public.

Through its standing committees, including those on Civil Rights, Immigration and Nationality Law, Federal Courts, Federal Legislation, International Security Affairs, Military Affairs and Justice, and International Human Rights, ABCNY strives to protect, preserve and promote civil liberties, civil rights and the democratic process. In its recent activities, ABCNY has sought to address the need to balance the fundamental interests of civil liberties and individual freedom with the demands of national security, and to assure that concerns for national security do not undermine the guarantees of civil liberties that are the hallmark of our constitutional democracy and a beacon to the world.

ABCNY is deeply concerned by Respondents' conduct here, which violated one of the oldest common law privileges – a privilege that is essential to the integrity of our system of justice. ABCNY therefore respectfully submits this brief, as a Friend of the Court, in support of Petitioners.

**PRELIMINARY STATEMENT**

In conducting their recent sweep of the cells of all detainees at Guantanamo Bay, Respondents systematically confiscated from Petitioners all confidential attorney-client communications in their possession. The wholesale seizure of these materials, and the unauthorized review of some of them, represents an unprecedented assault on the attorney-client privilege. The privilege protecting attorney-client confidences is the essence of effective representation, and lies at the heart of the fairness and functioning of our legal system. Respondents' unsanctioned and unjustifiable invasion of the attorney-client privilege has already caused Petitioners immeasurable harm. No further invasion of the privilege should be permitted, and Respondents' motion should be denied.

**ARGUMENT**

**I. THE ATTORNEY-CLIENT PRIVILEGE IS ESSENTIAL TO THE INTEGRITY OF OUR ADVERSARIAL SYSTEM OF JUSTICE**

The attorney-client privilege is the oldest of the evidentiary privileges. 8 Wigmore (Evidence) § 2290 (McNaughton Rev. 1961); *see also* Charles Alan Wright & Kenneth Graham, *Federal Practice and Procedure* § 5001 (2006) (stating that "the only privilege mentioned by the first evidence writers … is the attorney-client privilege"). It is well established, vigorously protected and assiduously observed. Initially, the purpose of the privilege was "to promote and preserve the honor of the attorney by freeing her from governmental demands to disclose secrets confided to her by clients." Stephen A. Saltzburg, *Privileges and Professionals: Lawyers and Psychiatrists*, 66 Va. L. Rev. 597, 604 (1980) (hereinafter "Saltzburg"). *See also* Max Radin, *The Privilege of Confidential Communication Between Lawyer and Client*, 16 Cal. L. Rev. 487,

487 (1928) (hereinafter "Radin") (noting that the original motivation for the privilege was the "common obligation of gentlemen not to betray a confidence.").

With evolution of the American legal culture, however, came recognition that the privilege was essential to effective advocacy. As one commentator explained:

> [F]rom the eighteenth century on, the duty of loyalty conceived in terms of the attorney's duty to his employer, has overwhelmed the notion of the gentleman-barrister's honor. It was not the lawyer's dignity but the client's interest that forbade disclosure of anything communicated between the two … .

Radin at 489. *See also*, Saltzburg at 604 (contrasting the original purpose of the privilege and its present rationale, which "is premised on the need to promote effective communication between the attorney and her client."); McCormick, *On Evidence* § 87, 316-17 (4th ed.) ("A strong tradition of loyalty attaches to the relationship of attorney and client, and this tradition would be outraged by routine examination of the lawyer as to the client's confidential disclosures regarding professional business.").

Indeed, modern American jurisprudence unequivocally recognizes that the free flow of information between a lawyer and a client is the foundation of meaningful representation. The Supreme Court most clearly articulated this principle in *Upjohn Co. v. United States*, 449 U.S. 383 (1981), explaining that the purpose of the privilege is

> to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy depends upon the lawyer's being fully informed by the client.

449 U.S. at 389. The privilege attaches when "(a) legal advice is sought; (b) the communication does not concern prospective 'wrongdoing'; (c) the advice is from a professional legal adviser in his capacity as such; (d) the communication was made in confidence; and (e) the communication was made by the client." Note, 91 Harv. L. Rev. 464, 467 n. 15 (1977) (internal citations omitted).

The Supreme Court has explicitly linked the privilege with the credibility and fairness of the American legal system, noting "the centrality of open client and attorney communication to the proper functioning of our adversary system of justice." *United States v. Zolin*, 491 U.S. 554, 562 (1989). The nature of the privilege as a fundamental guarantor of procedural fairness has also been explicated by commentators:

> The purpose of the privilege in the United States has always been to encourage people to seek legal advice freely and to communicate candidly with the attorney during those consultations. The rationale is that, by protecting client communications designed to obtain legal advice or assistance, the client will be more candid and will disclose all relevant information to his attorney, even potentially damaging and embarrassing facts. Complete client disclosure helps to ensure quality legal advice and assistance and makes it possible for the client to better understand his obligations and responsibilities under the law. This, in turn, will increase the law's effectiveness.

Rice, *Attorney-Client Privilege in the United States* (2d ed. 1999) at § 2.3. *See also* Saltzburg at 605 (articulating a similar policy rationale, that "[e]xpertise still is needed to achieve the expected efficiencies of modern process, to protect the legal rights of parties, and to discover when and how to avoid litigation.").

By its nature, the privilege imposes constraints on the fact-gathering of an adverse party. The privilege has accordingly been called "unpopular," and even "indefensible" when "abstractly considered." *See* Radin at 491. Yet, the values served by the privilege require that it be protected *notwithstanding* that it inhibits one party from accessing desired information. The rationale is that the information sought might never have been revealed other than as a communication within the protective confines of the attorney-client relationship:

> The privilege creates a zone of privacy in which an attorney and client can create information that did not exist before and might not exercise otherwise. Because the same information might not exist were it not for the privilege, any loss of information when the privilege is upheld may be more imagined than real.

Saltzburg at 610.

Respondents' unauthorized impoundment of privileged communications, and review of some of those communications, is undeniably an invasion of the attorney-client privilege. The seizure and examination of these materials undermines Petitioners' confidence that communications with their attorneys will be safeguarded from the opposing party and the court. The policy underlying the attorney-client privilege is served only if the client is entitled to expect that the confidentiality of legitimate attorney-client communications is inviolate. As the Supreme Court has stated, the privilege is

> 'founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure.'

*Upjohn*, 449 U.S. at 389, quoting *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888); *see also*, *U.S. v. Philip Morris*, 314 F.3d 612, 618 (D.C. Cir. 2003) ("The privilege promotes sound legal advocacy by ensuring that the counselor knows all the information necessary to represent his client. Only by ensuring that privileged information is never disclosed will these important interests be advanced." (citing *Upjohn* and *In re Ford Motor Co.*, 110 F.3d 954, 962 (3d Cir. 1997))). The client's certainty in her expectation that confidential communications will be protected from disclosure is at the heart of the policy rationale.

Inasmuch as predictability and certainty are indispensable to achieving the purpose of the attorney-client privilege, "[a]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." *Upjohn*, 449 U.S. at 393. *See also* Note, 91 Harv. L. Rev. 464, 464 (1977) (observing that "courts and commentators have insisted that a fixed rule of privilege be maintained."). Recognizing that "[t]he purpose of the privilege is to encourage clients to make full disclosure to their attorneys,"

the Supreme Court posited that non-adherence to the privilege would frustrate lawyers' ability to provide meaningful counsel:

> As a practical matter, if the client knows that damaging information could more readily be obtained from the attorney following disclosure than from himself in the absence of disclosure, the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice.

*Fisher v. United States*, 425 U.S. 391, 403 (1976); *see also* Radin at 490 (underscoring the importance of the client's interest in confidentiality, in stating that "[a]ll persons ought to be able fully and freely to tell their lawyers all the facts, however remote, which surround the case, without fear that the lawyer's knowledge of these facts may be used to establish claims against them or subject them to penalties.")

So central is the protection of client communications to the role of a lawyer that the duty not to disclose confidences is enshrined in all ethical guidelines governing the profession, including the ABA Code of Professional Responsibility ("ABA Code"). Lawyers are thus counseled to safeguard confidences in furtherance of their advocacy:

> The observance of the ethical obligation of a lawyer to hold inviolate the confidences and secrets of his client not only facilitates the full development of facts essential to proper representation of the client but also encourages laymen to seek early legal assistance.

ABA Code, Ethical Consideration 4-1. The duty to refrain from disclosing confidences survives the representation. During and after representation of a client, a lawyer has an obligation both to refrain from using or disclosing confidential client information, and to protect the information from disclosure by others, "if there is a reasonable prospect that [use or disclosure] will adversely affect a material interest of the client or if the client has instructed the lawyer" against disclosure. Restatement of Law Governing Lawyers § 60 (2000).

## II. THE ATTORNEY-CLIENT PRIVILEGE IS AT THE HEART OF PETITIONERS' RIGHT OF MEANINGFUL ACCESS TO THE COURTS

Petitioners are entitled to access the courts to challenge the legality and conditions of their confinement. *See Rasul v. Bush*, 542 U.S. 466 (2004). It is well settled that if the right of access to the courts is extended, such access must of necessity be "meaningful." *See Maine v. Moulton*, 474 U.S. 159, 170 (1985) ("Once the right to counsel has attached and been asserted, the State must of course honor it."); *Al Odah v. United States*, 346 F. Supp. 2d 1 (D.D.C. 2004). Meaningful access entails the right to counsel. *See Adem v. Bush*, 425 F. Supp. 2d 7 (D.D.C. 2006); *Al Odah*, 346 F. Supp. 2d 1. Indeed, Petitioners' right to counsel has explicitly been recognized by this Court. *See In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174 (D.D.C. 2004); *Al Odah*, 346 F. Supp. 2d at 8 (holding that Petitioners "are entitled to counsel, in order to properly litigate the habeas petitions presently before the Court and in the interest of justice.").

Inherent to the right to counsel is the right to engage in confidential communications with one's attorney, and the privilege that protects those communications from governmental intrusion. *See Martin v. Lauer*, 686 F.2d 24, 32 (D.C. Cir. 1982) ("Appellants' interest in speaking freely with their attorneys is interwoven with their right to effective assistance of counsel."). The *Al Odah* court explained that the attorney-client privilege was integral to the right of meaningful access to the courts; in doing so, it rejected Respondents' proposal to monitor communications between detainees and their lawyers as both unwarranted by articulated security concerns and without authority in law. *Al Odah*, 346 F. Supp. 2d at 10-12. The same court rejected Respondents' arguments that Petitioners' access to counsel could be curtailed because they did not enjoy the same constitutional protections as criminal defendants. Under *Al Odah*'s analysis, the distinction in the nature or source of an individual Petitioner's right has no

bearing; rather, the integrity of the process demands that "meaningful access" be granted if access is to be granted at all.

> [T]he case law indicates that where the client has been afforded the right to meaningful access to the courts, this right cannot be abridged, and that the ability to communicate in private with counsel is a crucial part of that meaningful access. In the instant case, Petitioners have been afforded access to the courts, which must necessarily be meaningful, and this meaningful access includes the opportunity to consult with counsel in private.

*Id.*, 346 F. Supp. 2d at 11 (citations omitted).

Unwarranted interference with a detained person's access to counsel burdens the right of meaningful access to the courts. In a detention setting, the risk of incidental or intentional invasion of the attorney-client privilege is great; nevertheless, to invade an inmate's communications with counsel based on the exigencies of prison administration "would undermine a critical component of the right of access to the courts." *Gomez v. Vernon*, 255 F.3d 1118, 1133 (9th Cir. 2001). Even prison procedures must accommodate an inmate's right to the protections of the privilege. *See United States v. DeFonte*, 441 F.3d 92, 96 (2d Cir. 2006) (holding that an inmate's documents, inadvertently separated from her during a move, could not be confiscated for use in a criminal proceeding against another, because they clearly noted the subject matter of past and anticipated conversations with counsel and were not intended to be disclosed); *Gomez*, 255 F.3d at 1131-33 (holding that the privilege was not waived for involuntarily disclosed materials where "inmates' actions to preserve the confidentiality of the materials were not only reasonable, but were found, as a question of fact, to be the best possible in the prison context.")

Accordingly, despite being in custody, Petitioners here were and continue to be entitled to the full protection of the attorney-client privilege, which safeguards the confidentiality of their communications with counsel.

### III. IN CARRYING OUT WHOLESALE IMPOUNDMENT AND REVIEW OF CERTAIN PRIVILEGED MATERIALS, <u>RESPONDENTS VIOLATED THE ATTORNEY-CLIENT PRIVILEGE</u>

There is no authority or precedent in this Court's previous decisions, or indeed in American law, for the wholesale confiscation of privileged materials from an entire population in custody. In carrying out the impoundment and review of certain privileged materials from detainee cells without seeking permission of, or even serving notice on, this Court, Respondents and their agents grossly violated the attorney-client privilege.

Respondents concede that among the detainee property they have confiscated are materials protected by attorney-client privilege. They attempt to justify this invasion of the privilege only upon vague and unsubstantiated allegations of a suicide plot. Respondents' Motion for Procedures Related to Review of Certain Detainee materials and Request for Expedited Briefing ("Resp. Br.") at 15, 16. In fact, Respondents' brief identifies only a single document that relates, however tenuously, to the attorney-client privilege: a paper stamped as attorney-client privileged, on which two of the deceased detainees allegedly wrote handwritten notes.[1] On the basis of a single piece of paper, Respondents made the unfounded assertion that the materials seized "demonstrated … that detainees had developed practices for misusing the existence of a privileged attorney-client communication system, presumably to shield the communications from the suspicion or scrutiny of JTF-Guantanamo guards." *Id.* at 8. The claim is without merit, and the Court should reject it.

---

[1] Apparently realizing that their arguments were wholly lacking in evidentiary support, Respondents now represent, in supplemental submissions to this Court, that they have carried out further unauthorized searches of privileged material. They claim that in the course of these searches they have identified other non-privileged handwritten notes written on paper stamped as "attorney-client privileged." Respondents' recitation of facts is silent as to the availability to detainees of other writing paper.

Respondents have provided no basis for this Court to conclude that there has been any misuse of the attorney-client privilege by any identifiable detainee.[2] Instead, the implicit logic of their position is that Respondents are entitled to a presumption that Petitioners are engaged in a sinister plot. Respondents posit that the peculiar exigency of the NCIS investigation warrants wholesale violation of the attorney-client privilege. However, the weakness of factual support for Respondents' arguments cannot be overcome by the force of their assertions.

The federal common law of privileges defines the scope and limitations of Petitioners' privilege claim, and provides the standard against which Respondents' invasive action must be measured. *See* Fed. R. Evid. 501; *Zolin*, 491 U.S. at 568. Respondents ignore relevant case law governing the standards and methods for invading the attorney-client privilege, and instead propound *sui generis* balancing test analyses purportedly rooted in public policy. They maintain that "extraordinary circumstances" warrant a review of the privileged materials by a Filter Team, and that "[t]he strong public policy interests in potentially saving lives and in maintaining security and order within a wartime detention facility outweighs any limited incursion into attorney-client materials." Resp. Br. at 15, 16. But there is no authority for ordering a "filter team" or "taint team" review on broad public policy grounds. On the contrary, as is eminently clear from Respondents' cited authorities, "filter team" or "taint team" reviews have *only* been ordered in cases where the impounded documents were seized pursuant to a proper warrant issued upon a finding of probable cause.[3]

---

[2] In their original submission in support of this motion, Respondents identified one piece of paper that, they assert, bore a stamp indicating it was "attorney-client privileged" and also a handwritten note that they claim was not a privileged communication.

[3] The Supreme Court has strongly cautioned against improper wide-ranging invasions of the privilege, holding that "[t]here is no reason to permit opponents of the privilege to engage in groundless fishing expeditions, with the district courts as their unwitting (and perhaps unwilling) agents." *Zolin*, 491 U.S. at 571.

Respondents' vague policy arguments, tendered in lieu of facts, are also flawed in that they ignore the well-articulated policy underpinnings of the attorney-client privilege.  Indeed, in any number of cases the privilege has been vindicated as against an investigator's or prosecutor's interest in discovering information; because the privilege is so crucial to fairness of an adjudication, its protection extends even to communications of potential evidentiary value.  *See Swidler & Berlin v. United States*, 524 U.S. 399, 408 (1998) (explaining that "the loss of evidence admittedly caused by the privilege is justified in part by the fact that without the privilege, the client may not have made such communications in the first place"); *Philip Morris*, 314 F.3d at 618 (noting that "[e]ven though enforcement of the privilege often results in the suppression of probative evidence, our jurisprudence has determined that its value outweighs these costs").  It is well settled that public policy weighs in favor of protecting the privilege of legitimate attorney-client communications, and Respondents' inability to make a factual showing to suggest that the privilege has been perverted is fatal to its motion.

### IV. THE SECURITY CONCERNS RESPONDENTS CITE DO NOT OFFER A COMPELLING RATIONALE FOR CURTAILING DUE PROCESS PROTECTIONS

It cannot be ignored that Respondents have throughout these proceedings maintained that Petitioners are not entitled to ordinary procedural protections because of special security concerns.  However, the exigencies of wartime or other security threats cannot justify implementation of a procedure that is fundamentally unfair.  *See Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006).  Military or wartime exigency does not excuse gross deviations from fundamental safeguards of process, including those enshrined in our Constitution and laws, as well as in the Geneva Conventions.  *See id.*  While *Hamdan* specifically addressed military commission proceedings, its analysis can be read more broadly as rejecting the Government's position that those due process guarantees that lend legitimacy to legal proceedings can be overridden at the

- 11 -

mere mention of countervailing security considerations. Just as the creation of an unfair tribunal cannot be justified based on purported security concerns, so under *Hamdan*'s reasoning, the integrity of the process cannot be compromised by an unwarranted invasion into confidential attorney-client communications.

## CONCLUSION

For the foregoing reasons, Respondents' motion should be denied in its entirety.

Dated: New York, New York
August 31, 2006

                    The Association of the Bar of the City of New York

                    By: _/s/_____
                    Committee on Military Affairs and Justice
                    Natalie Kabasakalian
                    Michael Mernin
                    42 West 44th Street
                    New York, NY 10036
                    (212) 382-6600

                    _/s/_____
                    Edward Labaton
                    100 Park Avenue, 12th Floor
                    New York, NY 10017-5563
                    (212) 907-0700