IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MOHAMMED RAJEB ABU GHANEM, et al.,<br><br>Petitioners,<br><br>v.<br><br>GEORGE W. BUSH,<br>President of the United States, et al.,<br><br>Respondents. | Civil Action No. 05-cv-1638 (CKK) |

## RESPONDENTS' MOTION FOR RECONSIDERATION OF JULY 10, 2007, ORDER

On July 9, 2007, petitioner moved for preliminary relief requiring the respondents to

provide notice before transporting or removing petitioner from Guantanamo Bay, Cuba. On July

10, 2007, the Court entered an Order (dkt. no. 53) imposing such a notice requirement.

Respondents respectfully seek reconsideration of the notice provision found in the Court's July

10 Order.[1]

The Court was without jurisdiction to include the notice provision in its Order. The

Court of Appeals held in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007), *cert. granted*, 75

U.S.L.W. 3707 (U.S. June 29, 2007) (No. 06-1195), that the Military Commissions Act of 2006

("MCA") has deprived this Court of jurisdiction over cases such as petitioner's. Further, on the

strength of the MCA and the *Boumediene* decision, the D.C. Circuit refused to interfere with a

transfer of a Guantanamo detainee in the context of an appeal from Judge Urbina's denial of a

---

[1] The parties have conferred in accordance with LCvR 7(m). Counsel for petitioner has indicated that the petitioner opposes respondents' request for reconsideration.

motion seeking to enjoin the transfer, explicitly noting that dismissal was required "for lack of subject matter jurisdiction." *Zalita v. Bush*, No. 07-5129 (Apr. 25, 2007) (copy attached as Exhibit 1).[2] Most recently, the D.C. Circuit denied an emergency motion for an order seeking 30 days' advance notice of any intended removal of a Detainee Treatment Act (DTA) petitioner detained at Guantanamo, concluding that under the MCA, the Court of Appeals lacked jurisdiction to grant the requested relief. *Hamlily v. Gates*, No. 07-1127 (D.C. Cir. July 16, 2007) (copy attached as Exhibit 4). Further, preliminary relief in the form of the type of pretransfer notice that petitioner sought is unwarranted under the standards applicable to preliminary injunctions. For these reasons, the Court should vacate the pretransfer notice portion of its July 10 Order.

## BACKGROUND

The petition in this case was filed on August 15, 2005, on behalf of Mohammed Rajeb Abu Ghanem, who is detained by the Department of Defense ("DoD") at the Guantanamo Bay Naval Base in Cuba ("Guantanamo"). *See* dkt. no. 1. Petitioner was previously determined by a Combatant Status Review Tribunal ("CSRT") to be an enemy combatant. *See* Decl. of Karen L. Hecker ¶¶ 2–3 (attached as Exhibit 5). Petitioner supposes that, at some point in the future, respondents might decide to transfer him to another country, one in which he might be mistreated. Thus, although the very purpose of this entire proceeding is presumably to achieve his release from detention at Guantanamo Bay, on July 9, 2007, petitioner Ghanem filed a

---

[2] A copy of Judge Urbina's order denying an injunction in *Zalita* is attached hereto as Exhibit 2. A motion seeking the same relief was subsequently denied by the Supreme Court in the *Zalita* case, *Zalita v. Bush*, 06A1005 (Sup.Ct. May 1, 2007) (copy attached as Exhibit 3), although with no discussion of the basis for the denial.

motion for an order requiring the respondents to provide 30 days' notice of any transfer of the petitioner out of Guantanamo Bay. *See* Notice Regarding Activity in this Case and Other Guantanamo Cases and Mot. For TRO and Prelim. Inj. Requiring Resp'ts to Provide Counsel for Pet'r and the Court with Thirty Days' Advance Notice of Intended Removal of Pet'r from Guantanamo (dkt. nos. 51, 52). On July 10, 2007, before the deadline for a response to that motion, the Court issued an order denying the petitioner's motion but requiring the respondents to provide the Court with 30 days' notice of "any release, repatriation, or rendition of the petitioner. Order (July 10, 2007) (dkt. no. 53) at 2.

Petitioner's request for an injunction ignored, and asked the Court to disregard, the law of the Circuit reflected in *Boumediene* that the Court lacks jurisdiction over cases such as petitioner's. Even beyond this jurisdictional bar, petitioner otherwise failed to make the showing required to justify the grant of the extraordinary injunctive relief he sought, controlling the timing of the repatriation or transfer of an alien enemy combatant during an ongoing, global armed conflict where such an injunction would interfere with the Executive's conduct of war-making and foreign policy. Petitioner's supposition that he may be mistreated if he is transferred is entirely speculative, and cannot form the basis for injunctive relief. Accordingly, jurisdictional reasons aside, the Court should not have granted the relief the petitioner sought and should not have otherwise imposed conditions equivalent to the requested relief.

Beyond the speculative nature of petitioner's belief as to what might happen to him in connection with a transfer, the factual premises of the motion that he filed are simply incorrect. As described in the declarations attached hereto as Exhibits 6 and 7, for any transfer, a key concern is whether the foreign government will treat the detainee humanely and in a manner

consistent with its international obligations. Williamson Decl. ¶ 4; Benkert Decl. ¶¶ 6-7. It is

the policy of the United States not to repatriate or transfer a detainee to a country where the

United States believes it is more likely than not that the individual will be tortured. *Id.* If a

transfer is deemed appropriate, a process is undertaken, typically involving the Department of

State, in which appropriate assurances regarding the detainee's treatment are sought from the

country to whom the transfer of the detainee is proposed. Benkert Decl. ¶ 6; Williamson Decl. ¶

5-6. Once DoD initially approves a transfer and requests the assistance of the Department of

State, the Department of State initiates transfer discussions with the foreign government

concerned. *Id.* Such discussions include an effort to seek assurances (in every transfer case in

which continued detention by the government concerned is foreseen) that the United States

Government considers necessary and appropriate with regard to the country in question. These

include assurances of humane treatment and treatment in accordance with the international

obligations of the foreign government accepting transfer. *Id.* Among other things, the

Department of State considers whether the nation in question is a party to relevant treaties such

as the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or

Punishment, and ensures that assurances are tailored accordingly if the nation concerned is not a

party or other circumstances warrant.[3] *Id.*

---

[3] The particulars of whatever discussions there might be between the Executive Branch and foreign countries in any specific case – including this one – are closely held within appropriate Executive Branch channels. The United States' ability to seek and obtain assurances from a foreign government depends on its ability to treat its dealings with the foreign government with discretion. Williamson Decl. ¶ 9; Benkert Decl. ¶ 8. Obviously, diplomatic sensitivities surround the Department of State's communications with foreign governments concerning allegations relating to torture. Williamson Decl. ¶ 9; Benkert Decl. ¶ 8. The United States Government typically does not unilaterally make public any specific assurances or other precautionary measures obtained, because such disclosure would have a chilling effect on and

-4-

The determination whether it is more likely than not an individual would be tortured by a receiving foreign government, including, where applicable, evaluation of foreign government assurances, involves senior level officials and takes into account a number of considerations, including whether the nation concerned is a party to certain treaties; the expressed commitments of officials of the foreign government accepting transfer; the particular circumstances of the transfer, the country, and the individual concerned; and any concerns regarding torture that may arise. Williamson Decl. ¶¶ 6-8; Benkert Decl. ¶¶ 6-7. Recommendations by the State Department are developed through a process involving the Bureau of Democracy, Human Rights, and Labor (which drafts the State Department's annual Country Reports on Human Rights Practices) and the relevant State Department regional bureau, country desk, or U.S. Embassy. Williamson Decl. ¶ 7. When evaluating the adequacy of assurances, State Department officials consider the identity, position, or other information concerning the official relaying the assurances; political or legal developments in the foreign country concerned that provide context for the assurances; and the foreign government's incentives and capacity to fulfill its assurances to the United States. Williamson Decl. ¶ 8. In an appropriate case, the State Department may consider various monitoring mechanisms for verifying that assurances are being honored. Id. If a case were to arise in which the assurances obtained from the receiving government were not sufficient when balanced against treatment concerns, the United States would not transfer a detainee to the control of that government unless the concerns were satisfactorily resolved. Benkert Decl. ¶ 7; Williamson Decl. ¶ 8. Indeed, circumstances have arisen in the past where DoD decided not to transfer detainees to their country of origin because

---

cause damage to this country's ability to conduct foreign relations. Williamson Decl. ¶ 9.

of mistreatment concerns. *Id.*

In sum, the Executive Branch employs an elaborate inter-agency process for evaluating

the propriety of transfers of Guantanamo detainees and implementing the United States' policy

not to repatriate or transfer a detainee to a country where the United States believes it is more

likely than not that the individual will be tortured. That process involves senior level officials

and includes consideration of the detainee's particular circumstances, an informed and

well-rounded analysis of the current situation on the ground in the prospective transferee

country, the input of various State Department offices with relevant knowledge, personal

interactions and negotiations with senior officials of the prospective transferee government, and

consideration of assurances provided by the prospective transferee country, as well as their

sufficiency and any mechanisms for verifying them. *See* Williamson Decl. ¶ 7 & *passim.*

## ARGUMENT

I.     **THE ORDER AT ISSUE HERE EASILY MEETS THE STANDARD
       APPLICABLE TO MOTIONS FOR RECONSIDERATION OF
       INTERLOCUTORY ORDERS**

A district court has broad discretion to reconsider its interlocutory orders in accordance

with Rule 54(b), Fed.R.Civ.P. Although the Court of Appeals for this Circuit has not provided

direction in this regard, the Judges of this Court ask whether "justice requires" reconsideration in

ruling on motions for such relief. *See, e.g., Lemmons v. Georgetown University Hosp.*, 241

F.R.D. 15, 22 (D.D.C. 2007); *Judicial Watch v. Department of Army*, 466 F.Supp.2d 112, 123

(D.D.C. 2006); *Singh v. George Washington University*, 383 F.Supp.2d 99, 101 (D.D.C. 2005).

Among the factors that are taken into account is whether the order to be reconsidered was based

on "'[e]rrors of apprehension [which] may include [the] Court's failure to consider controlling

decisions . . . .'" *Lemmons*, 241 F.R.D. at 22 (quoting *Singh*, 383 F.Supp.2d at 101). Another consideration cited in cases such as *Lemmons*, *Judicial Watch*, and *Singh*, is that "'where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.' *Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir.1964)." *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand*, 322 F.3d 147, 167 (2d Cir.2003). Here, reconsideration is certainly warranted.

First, in granting petitioner's request for pretransfer notice, the Court does not seem to have taken account of controlling authority. As mentioned above and explained more fully below, because *Boumediene* constitutes binding precedent in this Circuit, this Court lacked jurisdiction to order the notice that petitioner sought. While the Court's July 10 Order acknowledges the decision in *Boumediene* in general terms, it does not take its jurisdictional effect into account. Rather, it declines even to address the jurisdiction impact of *Boumediene*, instead reciting the fact that "the instant Court [was] guided by the following language: 'The district court may consider in the first instance . . . petitioners' motions to stay and hold in abeyance, which are currently pending before the district court . . . .'" Order at 2 n.1 (quoting from *Al Ginco v. Bush*, 06-5191 (D.C. Cir. June 7, 2007)). But the present question is not whether this Court may stay this case; it is whether affirmative injunctive relief may be awarded. This Court's July 10 Order does not – and cannot – say that *Al Ginco* supports a reading of *Boumediene* under which the Court could award injunctive orders. Indeed, the *Al Ginco* order that the Court cited relies on the jurisdictional holding of *Boumediene*. Because this Court did not consider that holding in enjoining respondents to provide pretransfer notice to petitioner, the July 10 order should be reconsidered.

Further, the order requiring pretransfer notice was entered before deadline for the government to respond to petitioner's motion and before any response was, in fact, filed. Therefore, the "litigants have not [even] once battled for the court's decision," making reconsideration particularly appropriate. For the reasons set forth below, the notice requirement in question should not have been ordered. The part of this Court's July 10 Order containing that requirement should be reconsidered and vacated.

II.    **THE COURT LACKS JURISDICTION TO ENTER AN ORDER REQUIRING THE RESPONDENTS TO PROVIDE ADVANCE NOTICE OF ANY TRANSFER OF THE PETITIONER FROM GUANTANAMO BAY.**

This Court lacks jurisdiction to condition petitioner's repatriation or transfer on prior notice. On October 17, 2006, the MCA was enacted. The MCA amended the habeas statute, 28 U.S.C. § 2241, adding a subsection (e) to provide that "[n]o court, justice, or judge shall have jurisdiction" to consider either (1) habeas petitions filed by aliens detained by the United States determined to be enemy combatants or awaiting such a status determination, or (2) any other action "relating to any aspect of the detention, *transfer*, treatment, trial, or conditions of confinement" of an alien who is or was so detained, except for the exclusive review mechanism in the Court of Appeals created under the DTA for addressing the validity of the detention of such an alien.[4] *See* MCA § 7(a) (emphasis added). This new amendment to § 2241 took effect on the date of enactment and applies specifically "to all cases, without exception, pending on or after the date of the enactment of this Act which relates to any aspect of the detention, transfer,

---

[4] *See* DTA § 1005(e)(2)-(3) (as amended by MCA §§ 9-10). Section 1005(e)(2) of the DTA, as amended, states that the D.C. Circuit "shall have exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant," and it further specifies the scope and intensiveness of that review.

treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001." *Id.* § 7(b).

On February 20, 2007, the Court of Appeals held in *Boumediene* that the MCA plainly applies to all cases filed by aliens detained as enemy combatants, including pending habeas petitions such as this one, and withdraws all District Court jurisdiction over such cases, including both habeas and non-habeas claims. *See* 476 F.3d 981, 986-88 & n.1; *id.* at 994 ("Federal courts have no jurisdiction in these cases."). The Court of Appeals also held that the withdrawal of habeas jurisdiction over pending cases did not violate the Suspension Clause because the alien detainees held at Guantanamo have no constitutional rights and because the constitutional right to seek habeas review does not extend to aliens held at Guantanamo. *Id.* at 988-94. Consequently, the Court of Appeals (1) ordered that the district courts' decisions on appeal be vacated and (2) dismissed the cases on appeal for lack of jurisdiction. *Id.* at 994.

The Supreme Court granted *certiorari* in *Boumediene* on June 29, 2007. *See Boumediene v. Bush,* 75 U.S.L.W. 3707 (June 29, 2007). However, at least while *Boumediene* remains pending before the Supreme Court, the law of this Circuit[5] remains settled: under the MCA,

---

[5] *See Ayuda, Inc. v. Thornburgh,* 919 F.2d 153, 154 (D.C. Cir. 1990) (Henderson, J., concurring) ("Once [an] opinion [is] released it [becomes] the law of this circuit."); *Vo Van Chau v. U.S. Dep't of State,* 891 F. Supp. 650, 654 (D.D.C. 1995) (holding that the district court was bound by the principle of *stare decisis* to abide by a Court of Appeals decision even though the Court of Appeals had not yet issued its mandate and even though the mandate was stayed during the pendency of a petition for rehearing). The fact that this Court must follow the law of the Circuit and dismiss this case is discussed in greater detail in respondents' Motion to Dismiss filed on April 19, 2007. The law of the circuit doctrine renders the decision of a panel of circuit judges binding on all other panels within that circuit, *LaShawn A. v. Barry,* 87 F.3d 1389, 1395 (D.C. Cir. 1996) (*en banc*), and therefore also on district courts within that circuit. And, "[t]he requirement that jurisdiction be established as a threshold matter ... is 'inflexible and without exception." *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 577 (1999) (internal quotation marks and citations omitted). Respondents' motion to dismiss has been granted in several cases

-9-

federal district courts do not have jurisdiction over cases brought by aliens at Guantanamo Bay

detained as enemy combatants, and such aliens do not have constitutional rights.[6] Accordingly,

the Court lacks jurisdiction over petitioner's case. This Court is not free to ignore the binding

precedent in *Boumediene* merely because the Supreme Court has granted review. *See Steel Co.*

*v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("'Without jurisdiction [a] court cannot

proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist,

the only function remaining to the court is that of announcing the fact and dismissing the

cause.'" (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)).[7] Consequently, this

---

based on the law of the circuit as established in *Boumediene*. *See, e.g., Sadkhan v. Bush*, 05-CV-1487 (RMC) (dkt. no. 51; May 9, 2007); *Al-Qahtani v. Bush*, 05-CV-1971 (RMC) (dkt. no. 39; May 9, 2007). Indeed, Judge Robertson dismissed the Guantanamo cases on his docket *sua sponte*. *See, e.g., Khan v. Bush*, 05-CV-1491 (JR) (dkt. no. 26; April 5, 2007); *Zuhoor v. Bush*, 05-CV-1011 (JR); (dkt. no. 19; April 5, 2007).

[6] Even prior to enactment of the MCA, the DTA invested the Court of Appeals with the same "exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant." *See* DTA § 1005(e)(2)-(3). This investment of exclusive jurisdiction in the Court of Appeals, independent of the MCA, deprived the District Court of jurisdiction in cases challenging the detention of enemy combatants. *See, e.g., Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-09 (1994) ("exclusive" jurisdiction under federal Mine Act precludes assertion of district court jurisdiction); *Laing v. Ashcroft*, 370 F.3d 994, 999-1000 (9th Cir. 2004) ("§ 2241 is ordinarily reserved for instances in which no other judicial remedy is available"); *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 75, 78-79 (D.C. Cir. 1984) (request for relief in district court that might affect Court of Appeals' future, exclusive jurisdiction is subject to the exclusive review of the Court of Appeals); *cf. id.* at 77 ("By lodging review of agency action in the Court of Appeals, Congress manifested an intent that the appellate court exercise sole jurisdiction over the class of claims covered by the statutory grant of review power."). In any event, with the enactment of the MCA, as the D.C. Circuit made clear in *Boumediene*, District Court jurisdiction has been unambiguously withdrawn.

[7] The D.C. Circuit's June 7, 2007, order in *Al Ginco v. Bush*, No. 06-5191, also did not change the law of the Circuit. The *Al Ginco* order merely noted that the district court "may consider in the first instance respondents' motion to dismiss and petitioners' motions to stay and hold in abeyance," without saying what result the District Court should reach with respect to either of the motions. The D.C. Circuit in *Al Ginco* presumably expected the District Court to

Court lacks authority to enter an order placing conditions on any transfer of the petitioner and has no choice but to grant respondents' motion to dismiss.

That the Court lacks jurisdiction to grant even preliminary injunctive relief was recently confirmed by this Court in another Guantanamo detainee habeas case. In *Hicks v. Bush*, No. 02-CV-0299 (CKK), petitioner asked the Court to preliminarily enjoin petitioner's trial by military commission, claiming irreparable harm of being tried by a commission that, petitioner argued, had no legitimate jurisdiction over him. In denying the motion for preliminary injunction, the Court explained,

> In *Boumediene*, the D.C. Circuit clearly held that Congress intended to deprive the federal district courts of jurisdiction over 'all cases, without exception, pending on or after the date of the enactment of [the MCA] which relate to any aspect of the detention, transfer, treatment, trial or conditions of detention of an alien detained by the United States since September 11, 2001,' and that Congress did so constitutionally . . . . As such, this Court lacks jurisdiction to review Petitioner's habeas petition.

*Hicks v. Bush*, No. 02-CV-0299 (CKK), 2007 WL 902303 at *5 (D.D.C. Mar. 23, 2007).

Importantly, the Court denied the motion without engaging in the traditional, four-part test used to determine the propriety of such relief because "*Boumediene* holds that this Court lacks jurisdiction to even consider Petitioner's claims, such that this Court is precluded from even engaging in a balancing of the factors that would be considered on a motion for a preliminary injunction." 2007 WL 902303 at *6. And it was on the basis of the jurisdictional holding in *Boumediene* that Judge Urbina and the D.C. Circuit denied a motion to enjoin a post-notice transfer just like the one at issue here in *Zalita v. Bush, supra*, a decision affirmed by the

---

resolve the motions in a manner consistent with the law of the Circuit as established in *Boumediene*, which held that district courts lack jurisdiction over actions challenging the detention of aliens held as enemy combatants.

Supreme Court.

On July 16, 2007, the D.C. Circuit denied a Guantanamo detainee's emergency motion seeking an order requiring the respondents to provide 30 days' advance notice of any intended removal of the petitioner. The court stated that under the MCA, it lacked jurisdiction to grant the requested relief. *Hamlily v. Gates*, No. 07-1127 (D.C. Cir. July 16, 2007).

Likewise here, the Court has no authority to enter an order placing conditions on any transfer of the petitioner out of Guantanamo Bay.

## III.    PETITIONER'S MOTION FAILED TO SATISFY THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION.

Even if the Court had moved beyond the jurisdictional bar to consider further petitioner's motion according to the standards for a preliminary injunction, there was no basis for an order granting the relief requested by the petitioner or imposing equivalent conditions. It is well-established that a request for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). To prevail in a request for a preliminary injunction, a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'" *See Katz v. Georgetown Univ.*, 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)). The irreparable harm that must be shown to justify a preliminary injunction "must be both certain and great; it must be actual and not theoretical." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674

(D.C. Cir. 1985).  Petitioner's motion failed to make the showing required to justify the grant of extraordinary injunctive relief.

***Petitioner Has No Likelihood of Success On the Merits.***  Petitioner has no likelihood of success on the merits because, as discussed above, the law of the Circuit is that § 7 of the MCA clearly deprives this Court of jurisdiction.  *See supra* I.  Even beyond that dispositive holding, however, petitioner did not otherwise demonstrate a likelihood of success on the merits.  The petitioner maintained that *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006), established that detainees may assert claims under the Due Process Clause and the Geneva Conventions.  However, *Hamdan* did not establish any such principle.  *Hamdan* dealt with the validity of the system in place at the time for trial of enemy combatants by military commissions.  The Supreme Court explicitly noted that it was not addressing any issues relating to the legality of the detention of enemy combatants.  *Id.* at 2798.  Furthermore, the Court of Appeals in *Boumediene* has since held that aliens detained at Guantanamo do not have constitutional rights.  *See* 476 F.3d at 988-94.  Furthermore, to the extent petitioner might want to base his motion on the Geneva Conventions, the Convention Against Torture and Other Cruel and Degrading Treatment and Punishment ("CAT"), or the United Nations Convention Relating to the Status of Refugees ("Refugee Convention"), he could not do so.  Neither the CAT nor the Refugee Convention gives rise to judicially enforceable rights.  *See, e.g.*, *Castellano-Chacon v. INS*, 341 F.3d 533, 544 (6th Cir. 2003) (Refugee Convention); 8 U.S.C. § 1252(a)(4) (CAT claims are not cognizable in a habeas petition); *see also Al-Anazi v. Bush*, 370 F. Supp. 2d 188, 194 (D.D.C. 2005) (Bates, J.) (rejecting petitioner's argument that the Foreign Affairs Reform and Restructuring Act of 1998, which implemented CAT in certain immigration-specific contexts,

-13-

could serve as a legal basis for prohibiting or limiting transfer of wartime detainees to other countries). And section 5(a) of the MCA, which provides that "no person may invoke the Geneva Conventions or any protocols thereto in any habeas corpus or other civil action or proceeding to which the United States, or a current or former officer . . . is a party as a source of rights" in any civil court proceeding, precludes petitioner's reliance on those Conventions as providing a basis for court relief in this matter. *See Boumediene*, 476 F.3d at 988 n.5 (sections 5(a) and 7 of the MCA preclude habeas jurisdiction over Geneva Conventions claims).

Further, even if some valid legal basis existed for petitioner's request for an injunction, the separation of powers would bar such relief. "[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch." *People's Mojahedin Org. v. Dep't of State*, 182 F.3d 17, 23 (D.C. Cir. 1999) (citing *Chicago & S. Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103 (1948)); *see also Holmes v. Laird*, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations such as this, '[t]he controlling considerations are the interacting interests of the United States and of foreign countries, and in assessing them [the courts] must move with the circumspection appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our international relations.'") (quoting *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 383 (1959)).[8] If the Court were to entertain petitioner's claim to a

---

[8] In *Holmes*, U.S. citizen-servicemembers sued to prevent the United States government from surrendering them to West German authorities to serve sentences for convictions by West German courts on criminal charges relating to their conduct while stationed in West Germany. Even in this situation involving U.S. *citizens*, the District Court and D.C. Circuit rejected the plaintiffs' invitation to examine the fairness of their treatment by the West German courts and declined to enjoin the transfer, the latter court holding that "the contemplated surrender of appellants to the Federal Republic of Germany is a matter beyond the purview of this court." 459 F.2d at 1225.

right to contest repatriation or removal from Guantanamo, it would insert itself into the most sensitive of diplomatic matters.  Judicial review of a transfer or repatriation decision would involve scrutiny or second-guessing of United States officials' judgments and assessments on the likelihood of torture in a foreign country, including judgments regarding the state of diplomatic relations with a foreign government, the reliability of information concerning and representations from a foreign government, the adequacy of assurances provided and a foreign government's capability to fulfill them.  Williamson Decl. ¶¶ 8-12.  Second-guessing in such matters by the courts or others could chill important sources of information and interfere with or undermine our ability to interact effectively with foreign governments, including our ability to obtain cooperation of other nations in the war on terrorism.  *See* Williamson Decl. ¶¶ 8-12; Benkert Decl. ¶ 8.[9]

Because of these foreign relations implications, as developed most extensively in the analogous context of extradition, courts have uniformly eschewed inquiry into "'the fairness of a requesting nation's justice system'" and "'the procedures or treatment which await a surrendered fugitive in the requesting country.'"  *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997) (quoting *Arnbjornsdottir-Mendler v. United States*, 721 F.2d 679, 683 (9th Cir. 1983)); *see Al-Anazi*, 370 F. Supp. 2d at 194 (holding that this "well-established line of cases in the

_____

[9] It is certainly beyond argument that the courts of the United States would have no authority to interfere with any decision of a foreign sovereign nation regarding detention or prosecution of its own national being returned to it pursuant to its own laws. *See Worldwide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164-65 (D.C. Cir. 2002) ("The act of state doctrine precludes the courts of this country from inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory.") (internal quotation marks and citation omitted).

extradition context" "counsel[s] even further against judicial interference"). This principle is sometimes called the Rule of Non-Inquiry. For example, in *Ahmad v. Wigen*, 910 F.2d 1063 (2d Cir. 1990), a United States citizen was extradited from the United States to Israel to stand trial for an alleged terrorist attack. While the district court upheld the extradition only after receiving testimony and extensive documentation concerning Israel's law enforcement system and treatment of prisoners, the Second Circuit held that such inquiry was wholly improper. "The interests of international comity are ill-served," the Second Circuit explained, "by requiring a foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced." *Id.* at 1067. "It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds." *Id. Accord Escobedo v. United States*, 623 F.2d 1098, 1107 (5th Cir. 1980) (refusing to bar extradition based on allegations that appellant "may be tortured or killed if surrendered to Mexico," because "the degree of risk to [Escobedo's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch") (internal quotation marks omitted); *Peroff v. Hylton*, 563 F.2d 1099, 1102 (4th Cir. 1977); *Matter of Extradition of Sandhu*, 886 F. Supp. 318, 321-23 (S.D.N.Y. 1993); *Hoxha v. Levi*, 465 F.3d 554, 564-65 (3d Cir. 2006) (holding that allegations that individual would be tortured after extradition to Albania were solely for the Secretary of State to weigh, and not an appropriate subject for judicial inquiry). *See generally* Jacques Semmelman, *Federal Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings*, 76 Cornell L. Rev. 1198 (1991).

The force of these principles is not diminished by the fact that the subject of petitioner's motion and the Court's order is a potential repatriation or transfer from Guantanamo, rather than

-16-

an extradition. The considerations that underlie the Rule of Non-Inquiry are not endemic to the

specific context of extradition, but instead rest on the constitutional separation of powers.[10]

Furthermore, those considerations are all the more weighty in matters, such as this, involving

repatriation or transfer of alien enemy combatants during an ongoing, global war against al

Qaeda, the Taliban, and associated forces. If courts cannot, in the context of extradition, inquire

into transfers of United States persons to another country for criminal prosecution, they certainly

cannot inquire into and disrupt the repatriation and transfer of aliens held abroad in connection

with an ongoing armed conflict, where the Executive's conduct of war-making and foreign

policy is implicated. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 531 (2004) (plurality opinion)

("Without doubt, our Constitution recognizes that core strategic matters of war-making belong in

the hands of those who are best positioned and most politically accountable for making them.").

Accordingly, there is no basis in law for an injunction barring the repatriation or transfer

of an alien enemy combatant, such as petitioner, during wartime. Thus, petitioner had no

likelihood of success to support his request for an injunction against transfer, and there was no

basis for a preliminary injunction or an equivalent order.

---

[10] *See Matter of Requested Extradition of Smyth*, 61 F.3d 711, 714 (9th Cir. 1995)
("Undergirding this principle is the notion that courts are ill-equipped as institutions and
ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into
and pronouncements about the workings of foreign countries' justice systems."); *Sandhu*, 886 F.
Supp. at 321 ("The rule of non-inquiry arises from recognition that the executive branch has
exclusive jurisdiction over the country's foreign affairs."); *cf. Holmes*, 459 F.2d at 1219-23
(holding, in a non-extradition context, that considerations similar to those embodied in the Rule
of Non-Inquiry made it improper for the Judiciary to examine allegations of unfairness in a
foreign nation's trial of a U.S. citizen); *People's Mojahedin*, 182 F.3d at 23 (expressing
reluctance of courts to interfere in matters "'for which the Judiciary has neither aptitude,
facilities nor responsibility and have long been held to belong in the domain of political power
not subject to judicial intrusion or inquiry'") (quoting *Chicago & S. Air Lines*, 333 U.S. at 111)).

***Petitioner Did not Demonstrate Irreparable Injury.*** Petitioner also did not carry his

burden to show irreparable injury that is "certain and great . . . actual and not theoretical,"

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), by merely speculating that,

contrary to the policies and processes attested to in the sworn declarations of high-level

Executive Branch officials, the United States may repatriate or transfer petitioner under

circumstances where he might be tortured. Those declarations make clear that it is the policy of

the United States not to repatriate or transfer a detainee to a country when the United States

believes, based on a number of factors and considerations, it is more likely than not that the

individual will be tortured there. Williamson and Benkert Decls., *passim*. To implement this

policy, the Executive Branch employs an elaborate inter-agency process for evaluating the

propriety of transfers of Guantanamo detainees that involves senior level officials and includes

consideration of the detainee's particular circumstances, an informed and well-rounded analysis

of the current situation on the ground in the prospective transferee country, the input of various

State Department offices with relevant knowledge, personal interactions and negotiations with

senior officials of the prospective transferee government, and consideration of assurances

provided by the prospective transferee country, as well as their sufficiency and any mechanisms

for verifying them. *Id.* Further, a transfer will not take place where concerns about the treatment

of a detainee after transfer cannot be satisfactorily resolved. *Id.* To conclude that an injunction

barring the intended transfer of petitioner is nevertheless necessary would require the Court to

conclude that the United States' policies and practices are somehow a sham or pretext. There is

no valid basis for such an assumption. *Cf. Almurbati v. Bush*, 366 F. Supp. 2d 72, 78 (D.D.C.

2005) (Walton, J.) (holding that respondents' sworn declarations "directly refute the petitioners'

allegations of their potential torture, mistreatment and indefinite detention to which the United States will in some way be complicit").

Accordingly, petitioner did not demonstrate irreparable harm justifying an injunction conditioning a repatriation or transfer of the petitioner on prior notice.

**The Balance of Harms Warranted Denial of the Injunction.** While petitioner argued that Respondents would not be harmed by an injunction restricting repatriation or transfer of the petitioner, *see* Pet'rs Mot. at 6–7, in fact consideration of the equities and the harm that would flow from such an injunction warranted denial of the relief requested in the petitioner's motion and weighed against entry of an order imposing equivalent conditions.

Petitioner's requested injunction entailed grave harms that compel that it be denied. As explained *supra*, allowing for the second-guessing of a determination to repatriate or transfer petitioner would involve Court intervention into sensitive diplomatic matters and would interfere with or undermine the government's ability to conduct foreign affairs, interact effectively with foreign governments, and obtain cooperation of other nations in the war on terrorism. *See* Williamson Decl. ¶¶ 8-10, 12; Benkert Decl. ¶ 8. *See also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with other governments"). Constitutional and public interests favor allowing the Executive Branch, which is constitutionally vested with the authority both to conduct military functions such as detention of enemy combatants for the duration of hostilities[11] and to engage in foreign relations, to act without undue intrusion within its constitutional sphere of responsibility. As one Judge of this

---

[11] *See Hamdi*, 542 U.S. at 518-19.

Court has held:

> [T]here is a strong public interest against the judiciary needlessly intruding upon the foreign policy and war powers of the Executive on a deficient factual record. Where the conduct of the Executive conforms to law, there is simply no benefit – and quite a bit of detriment – to the public interest from the Court nonetheless assuming for itself the role of a guardian ad litem for the disposition of these detainees. *See People's Mojahedin Org.*, 182 F.3d at 23 ("[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch.").

*Al-Anazi*, 370 F. Supp. 2d at 199.

Here, petitioner asked this Court to impose a condition on the repatriation or transfer of an alien enemy combatant held outside the United States during wartime. Separation of powers and other public interests warranted the rejection of petitioner's request. *See Hamdi*, 542 U.S. at 531 ("Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them.").

\* \* \*

Accordingly, the Court lacked jurisdiction to include the pretransfer notice provision in its July 10 Order, and petitioner did not establish a basis for such relief.

## CONCLUSION

For the reasons stated above, respondents respectfully request that the Court reconsider its Order of July 10, 2007, and vacate that order to the extent that it requires respondents to provide advance notice to the Court of "any release, repatriation, or rendition" of the petitioner.

Dated: July 24, 2007

Respectfully submitted,
PETER D. KEISLER
Assistant Attorney General

DOUGLAS N. LETTER
Terrorism Litigation Counsel


   /s/ JAMES C. LUH
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
JUDRY L. SUBAR (D.C. Bar 347518)
TERRY M. HENRY
JAMES J. SCHWARTZ
JEAN LIN
ROBERT J. KATERBERG
ANDREW I. WARDEN
NICHOLAS A. OLDHAM
JAMES C. LUH
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC 20530
Tel: (202) 514-4938
Fax: (202) 616-8470

Attorneys for Respondents